UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| IRMA JOYCE SANDERS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:11-CV-203 JAR-NAB |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Security, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION OF**
**UNITED STATES MAGISTRATE JUDGE**

This is an action under 42 U.S.C. § 405(g) for judicial review of the Commissioner of Social Security's final decision denying Irma Sanders' ("Sanders") application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq.* Sanders alleges disability due to reflex sympathetic dystrophy[1] ("RDS") and arthritis. Sanders filed a Brief in Support of Plaintiff's Complaint. [Doc. #15]. The Commissioner filed a Brief in Support of the Answer. [Doc. #18]. This matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1) for a report and recommendation. [Doc. 5].

**I.    PROCEDURAL HISTORY**

On July 2, 2008, Sanders applied for disability insurance benefits. (Tr. 76.) Her claim was denied on initial consideration on July 25, 2008. (Tr. 34-38.) Next, Sanders requested a hearing before an administrative law judge ("ALJ"). (Tr. 41.) Her request was granted and following the hearing, the ALJ issued a written opinion, upholding the denial of benefits. (Tr. 11-15.) On October 11, 2011, the Appeals Council denied Sanders' request for review. (Tr. 1-

---
[1] Reflex sympathetic dystrophy (RSD) is diffuse persistent pain usually in an extremity often associated with limitation or immobility of joints. Stedman's Medical Dictionary 558 (27th ed. 2000).

1

3.)  The ALJ's decision thus stands as the Commissioner's final decision.  Sanders then filed an appeal to the district court on November 9, 2011.  [Doc. 3].

## II. ADMINISTRATIVE RECORD

### A. Testimony Before the ALJ

On February 3, 2010, the ALJ held a hearing and heard testimony from Sanders.  (Tr. 19-31.)  Sanders was represented by counsel.  (Tr. 21.)

Sanders testified as follows.  At the time of the hearing, Sanders was 51 years old.  (Tr. 23.)  She completed the eleventh grade.  (Tr. 24.)  Sanders does not have a general education diploma.  (Tr. 24.)  Sanders began working at Elder's Manufacturing Company sewing suits at the age of 18.  (Tr. 29.)  She had no trouble performing this job, but was laid off when the factory shut down in the early 1980's.  (Tr. 25, 29-30.)  She denied being able to perform that work today.  (Tr. 30.)  Sanders claimed to have not worked since that time, but also acknowledged work history up to 1990.  (Tr. 25, 30.)  Sanders testified that her husband supported her.  (Tr. 30.)

Sanders testified that her condition was a birth defect.  (Tr. 26.)  She described the problem with her leg as "[i]t's like you had a stroke, but you didn't have a stroke."  (Tr. 25.)  She stated she had no movement below the knee and described her muscles and joints as being deteriorated.  (Tr. 25.)  Sanders went to the doctor during the 1980's, but she didn't keep any records.  (Tr. 26.)  She also saw a Dr. Poe during this time but noted he was recently deceased.  (Tr. 27.)  She stated there was no treatment and there's nothing "they" can do."  (Tr. 26.)

As a child, Sanders' foot became deformed as the toes were broken and set twice to prevent them from "being turned under."  (Tr. 29.)  This caused her to have problems walking and muscle coordination.  (Tr. 29.)  Sanders noted that she had no mental problems during the

relevant period but currently has them due to feeling like a burden on her husband. (Tr. 30.) Sanders testified that she had a nerve block installed in her lower back intended to control her pain. (Tr. 30.) Despite the implantation of the nerve block, Sanders asked her doctors to amputate her leg because she would rather have prosthesis. (Tr. 25-26.) Sanders also testified that she has a driver's license and no limits have been placed on her driving. (Tr. 24.)

    **B.    Medical Records**

Sanders produced no medical evidence prior to the date she was last insured, September 30, 1986. The earliest evidence in the administrative record is dated in 2001, fifteen years after her date last insured.

On June 14, 2001, an MRI was taken of Sanders's lumbar spine and thoracic spine. (Tr. 181, 191.) The lumbar spine MRI showed small central disc protrusions at the L4-5 and L5-S1, but there were no abnormalities at L1-2, L2-3, or L3-4. (Tr. 181.) The thoracic spine MRI showed normal vertebrae from T1-T12. (Tr. 191.)

Sanders visited Dr. Andrew Walker several times between March 8, 2007 and December 2007 and in February and August of 2009. Sanders reported pain and reduced functionality in her left foot. (Tr. 177, 187, 194, 200). Dr. Walker noted that Sanders walked with a splint on her left foot and that she was born with congenital club foot. (Tr. 176.) Dr. Walker diagnosed Sanders with RDS. (Tr. 176, 180, 187, 194, 196, 200). In September 2007, Dr. Walker implanted a dorsal column stimulator[2] on a trial basis, which Sanders reported reduced her pain's intensity by fifty percent. (Tr. 194.) Due to the stimulator's success, Dr. Walker implanted a permanent dorsal column stimulator in December 2007. (Tr. 192-193.) Dr. Walker noted that the stimulator covered her pain, but there was too [much] damage to the cartilage. (Tr. 196.)

---

[2] A dorsal column stimulator applies electrodes to the dorsal columns of the spinal cord. Stedman's Medical Dictionary 1700 (27th ed. 2000).

3

On May 1, 2008, Sanders saw Dr. August Ritter (Tr. 215-16.) Sanders reported she had had had eight to ten years of increasing ankle and hind foot pain. (Tr. 215.) He also noted that Sanders' childhood history was positive for treatment in the mid and early 1960s for a club foot that was treated with casting that left her with a plantar grade foot. (Tr. 215.) Dr. Ritter's examination found Sanders had "fairly profound" motor deficit in ankle dorsification and plantar flexion. (Tr. 215.) X-rays confirmed some subtalar arthritis and early mid foot arthritis but no sign of other acute abnormalities. (Tr. 215.) Dr. Ritter diagnosed Sanders with subtalar arthritis, superimposed on a peripheral motor neuropathy of uncertain etiology. (Tr. 216.)

Sanders visited Dr. Ritter twice in June and July 2008. Sanders reported that she was "much improved and much less tender." (Tr. 219, 221.) Dr. Ritter found no swelling or other objective abnormalities other than stiffness. (Tr. 219.) On October 16, 2009, Sanders visited Dr. Ritter's office and was seen by Robb Brodie, a physician's assistant. (Tr. 224.) Sanders complained of pain in her left heel and in the bottom of her left foot. (Tr. 224.) Mr. Brodie noted Sanders' pain had been "going on for some time now, gradually getting worse." (Tr. 224.) A physical examination revealed zero motor control in plantar flexion, dorsiflexion, inversion, eversion, and significant tenderness at the bottom of the heel. (Tr. 224.) Mr. Brodie diagnosed Sanders with plantar fasciitis of the left foot and progressing motor neuropathy of the left lower extremity. (Tr. 224.)

On October 13, 2009, Sanders visited the ER at St. Francis Medical Center. (Tr. 209-13.) Sanders reported left ankle pain and tenderness. (Tr. 209.) She also reported feeling pain while walking. (Tr. 209.) A physical examination showed pain and tenderness in the left heel. (Tr. 210.) Sanders received a diagnosis of RSD and left heel pain. (Tr. 209.)

On November 6, 2009, Sanders saw Dr. Bernard Burns. (Tr. 225-26.) He noted that Sanders was born with a left clubfoot and had had extensive treatment as a child for that condition with casting. (Tr. 225.) Dr. Burns opined that Sanders had chronic pain syndrome and probable complex regional pain syndrome. (Tr. 226.) Sanders reported that the dorsal column stimulator "did not give her the relief she is looking for." (Tr. 225.) Dr. Burns tried to speak to Sanders about her daily activities but noted he had a "difficult time" doing so, because she reported getting "done what she needs to and [left] the question somewhat open-ended." (Tr. 225.)

### C. Other Records

On May 27, 2009, a DISCO Disability Insurance Benefits Insured Status Report showed Sanders was last insured through September 30, 1986. (Tr. 94.) Sanders earned income from 1975 through 1981, with a sharp decrease in earnings in 1981. (Tr. 95.) Sanders earned no income from 1982 to 1985. (Tr. 95.) Sanders had income from 1986 through 1992. (Tr. 95.) No income was reported from 1993 through 2009. (Tr. 95.)

### III. ALJ DECISION

The ALJ found that Sanders met the insured status requirements of the Social Security Act through September 31, 1986. (Tr. 13.) Next, the ALJ determined that Sanders had not engaged in substantial gainful activity during the period from her alleged onset date of June 30, 1981 through her date of last insured of September 30, 1986. (Tr. 13.) Then, the ALJ determined that there were no medical signs or laboratory findings to substantiate the existence of a severe medically determinable impairment. (Tr. 13.) The ALJ noted that Sanders was treated for club foot as a child but the evidence failed to show that this childhood condition was more than a "non-severe" impairment during the relevant period. (Tr. 14.) Because there was no

medical evidence showing her condition was severe, the ALJ concluded that Sanders was not disabled from June 30, 1981, the alleged onset date, through September 30, 1986, the date last insured. (Tr. 14.)

## IV. LEGAL STANDARD

Under the Social Security Act, the Commissioner has established a five-step process for determining whether a person is disabled. 20 C.F.R. § 404.1520. "'If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled.'" *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (quoting *Eichelberger v. Barnhart*, 390 F.3d 584, 590-91 (8th Cir. 2004)). In this sequential analysis, the claimant first cannot be engaged in "substantial gainful activity" to qualify for disability benefits. 20 C.F.R. § 404.1520(b). Second, the claimant must have a severe impairment. 20 C.F.R. § 404.1520(c). The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities…." *Id.* "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on [his or] her ability to work." *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting *Caviness v. Massanari*, 250 F.3d 603, 605 (8th Cir. 2001).

Third, the ALJ must determine whether the claimant has an impairment which meets or equals one of the impairments listed in the Regulations. 20 C.F.R. § 404.1520(d); Part 404, Subpart P, Appendix 1. If the claimant has one of, or the medical equivalent of, these impairments, then the claimant is per se disabled without consideration of the claimant's age, education, or work history. 20 C.F.R. § 404.1520(d).

Fourth, if the impairment does not meet or equal a listed impairment, the ALJ must assess and make a finding about the claimant's residual functional capacity ("RFC"). At this step, the burden rests with the claimant to establish his or her RFC. *Steed v. Astrue*, 524 F.3d 872, 874 n.3 (8th Cir. 2008). *See also Eichelberger*, 390 F.3d at 590-91; *Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir. 2004). RFC is defined as what the claimant can do despite his or her limitations, 20 C.F.R. § 404.1545(a)(1), and includes an assessment of physical abilities and mental impairments. 20 C.F.R. § 404.1545(b)-(e). The ALJ will review a claimant's RFC and the physical and mental demands of the claimant's past relevant work.[3] 20 C.F.R. § 404.1520(e). If it is found that the claimant can still perform past relevant work, the claimant will not be found to be disabled. 20 C.F.R. § 404.1520(f). If the claimant cannot perform past relevant work, the analysis proceeds to step five. 20 C.F.R. § 404.1520(g).

At the fifth and last step, the ALJ considers the claimant's RFC, age, education, and work experience to see if the claimant can make an adjustment to other work. 20 C.F.R. § 404.1520(g)(1). If it is found that the claimant cannot make an adjustment to other work, the claimant will be found to be disabled. *Id*. At this step, the Commissioner bears the burden to "prove, first that the claimant retains the RFC to perform other kinds of work, and, second that other work exists in substantial numbers in the national economy that the claimant is able to perform." *Goff*, 421 F.3d at 790; *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000). The Commissioner must prove this by substantial evidence. *Warner v. Heckler*, 722 F.2d 428, 431 (8th Cir. 1983). If the claimant satisfies all of the criteria of the five-step sequential evaluation process, the ALJ will find the claimant to be disabled. 20 C.F.R. § 404.1520(g)(1). The ultimate

---

[3] "Past relevant work is work that [the claimant] has done within the past 15 years, that was substantial gainful activity, and that lasted long enough for [the claimant] to learn how to do it." *Mueller v. Astrue*, 561 F.3d 837, 841 (8th Cir. 2009) (citing 20 C.F.R. § 404.1560(b)(1)).

burden of persuasion to prove disability, however, remains with the claimant." *See Perks v. Astrue,* 687 F.3d 1086, 1092 (8th Cir. 2012).

This court reviews the decision of the ALJ to determine whether the decision is supported by "substantial evidence" in the record as a whole. *See Smith v. Shalala*, 31 F.3d 715, 717 (8th Cir. 1994). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002). *See also Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007). Therefore, even if a court finds that there is a preponderance of the evidence against the ALJ's decision, the ALJ's decision must be affirmed if it is supported by substantial evidence. *Clark v. Heckler*, 733 F.2d 65, 68 (8th Cir. 1984). In *Bland v. Bowen*, 861 F.2d 533, 535 (8th Cir. 1988), the Eighth Circuit Court of Appeals held:

> [t]he concept of substantial evidence is something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the Secretary may decide to grant or deny benefits without being subject to reversal on appeal.

As such, "[the reviewing court] may not reverse merely because substantial evidence exists for the opposite decision." *Lacroix v. Barnhart*, 465 F.3d 881, 885 (8th Cir. 2006) (quoting *Johnson v. Chater*, 87 F.3d 1015, 1017 (8th Cir. 1996)). Similarly, the ALJ decision may not be reversed because the reviewing court would have decided the case differently. *Krogmeier*, 294 F.3d at 1022.

## V. DISCUSSION

A claimant seeking disability insurance benefits must establish she was disabled before the expiration of her insured status. *Cox v. Barnhart*, 471 F.3d 902, 907 (8th Cir. 2006). While evidence from outside the insured period can be used in "helping to elucidate a medical

8

condition during the time for which benefits might be rewarded," it cannot serve as the only support for the disability claim. *Pyland v. Apfel*, 149 F.3d 873, 877 (8th Cir.1998).

As the ALJ noted, Sanders produced no medical evidence showing she was disabled from June 30, 1981, the alleged onset date, to September 30, 1986, the date last insured. The earliest medical treatment records are from June 2001, fifteen years after the date last insured. In those records, Dr. David Anderson noted Sanders had a history of a Charcot-Marie-Tooth disease,[4] but also found that MRIs of her lumbar and thoracic spine were substantially normal. (Tr. 181, 191.)

Sanders asserts that the medical histories in her current medical records show that she has "a history of club feet and problems all through her life and long before September 30, 1986." Drs. Walker, Ritter, and Burns all noted that Sanders had received extensive treatment as a child for a club foot. (Tr. 176, 215, 225.) This medical history given in the doctors' treatment records is based on a combination of Plaintiff's self-reporting about her childhood treatment in the 1960's and physical examinations at the time of treatment. There is no medical evidence in these recent records, however, regarding any medical treatment during the relevant time period that would help substantiate Sanders' claims that she was eligible for disability insurance benefits between 1981 and 1986.

Although Dr. Ritter's treatment notes from May 2008 indicate that Sanders reported that she had eight to ten years of increasing ankle and hind foot pain, this eight to ten year period is still well after Sanders' last insured date. (Tr. 215.) Sanders frequently visited several doctors for left extremity pain beginning in May 2007, but there is no record of consistent treatment prior to that date. The lack of regular treatment suggests that Sanders' condition was not severe prior

---

[4] Charcot-Marie-Tooth disease is a group of inherited nerve diseases characterized by slowly progressive weakness and wasting of the muscles of the lower parts of the extremities. Encyclopedia Britannica Online Academic Edition, Encyclopedia Britannica, Inc., 2012 <http://www.britannica.com/EBchecked/topic/106351/Charcot-Marie-Tooth-disease>, Accessed December 3, 2012.

9

to that time. *See Shannon v. Chater*, 54 F.3d 484, 486 (8th Cir. 1995) ("While not dispositive, a failure to seek treatment may indicate the relative seriousness of a medical problem.") Therefore, the medical record does not provide any information on Sanders' condition during the relevant period when benefits might have been awarded.

Additionally, Sanders cannot rely on her testimony alone that she met the requirements for receiving disability insurance benefits prior to September 1986.

> An individual's statement as to pain or other symptoms shall not alone be conclusive of disability . . . there must be medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all evidence required to be furnished . . . would lead to a conclusion that the individual is under a disability.

42 U.S.C. § 423(d)(5)(A).

Other evidence in the medical record supports the ALJ's decision. Sanders testified that she had no trouble performing her previous work as a seamstress but stopped working in the early 1980's when the factory shut down. (Tr. 30.) Therefore, Sanders did not leave her employment due to her medical condition, but because she was terminated. (Tr. 25, 29-30.) It is relevant that a claimant leaves work for reasons other than her medical condition. *Goff v. Barnhart*, 421 F.3d at 793 (relevant that claimant lost job for slapping patient and not medical condition). Finally, the ALJ specifically asked Sanders what prevented her from working during the relevant time period. In response, Sanders testified that she was "born this way" but that she "made do with what I could make do with" and, while there were "certain things that [she is] not capable of doing," she had had no problem performing her previous work as a seamstress, before the recession hit and she lost her job. (Tr. 25.)

Based on the testimony, medical evidence, and requirements for establishing disability during the relevant time period, Sanders has failed to carry her burden to establish that she is eligible for disability benefits between 1981 and 1986. Therefore, the ALJ did not err in denying her application for disability insurance benefits. Substantial evidence in the record as a whole supports the ALJ's decision.

## VI. CONCLUSION

For the reasons set forth above, the undersigned finds that substantial evidence on the record as a whole supports the Commissioner's decision that Sanders is not disabled and recommends that that ALJ's decision be affirmed.

Accordingly,

**IT IS HEREBY RECOMMENDED** that the relief which Plaintiff seeks in her Complaint (Doc. #1) and Brief in Support of Complaint (Doc. #15) be **DENIED** and that judgment be entered in favor of the Commissioner.

The parties are advised that they have fourteen (14) days in which to file written objections to these recommendations pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. *See Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990).

Dated this 3rd day of December, 2012.

    /s/ Nannette A. Baker
NANNETTE A. BAKER
UNITED STATES MAGISTRATE JUDGE